664 So.2d 398 (1995)
Anthony MANZELLA
v.
John DOE, New Orleans Aviation Board, and United States Fidelity and Guaranty Company.
No. 94-C-2854.
Supreme Court of Louisiana.
December 8, 1995.
Order Granting Rehearing in Part January 30, 1996.
*399 Patricia D. Miskewicz, Clyde Arnold Ramirez, for Applicant.
Mary Lois Duvigneaud, Warren S. Edelman, for Respondent.
JOHNSON, Justice[1].
On Saturday, May 12, 1990, at approximately 5:22 a.m., Anthony J. Manzella was driving his 1984 Chevrolet El Camino on I-610 East near the Elysian Fields Avenue exit ramp. Mr. Manzella was injured when his vehicle was rear-ended by a 1989 Chevrolet pick up owned by the City of New Orleans and assigned to the New Orleans Aviation Board (NOAB). Following the accident, the driver of the NOAB vehicle fled the scene on foot. Mr. Manzella instituted suit against John Doe, the unknown driver of the NOAB vehicle, the City of New Orleans, the owner of the NOAB vehicle, NOAB, and United States Fidelity & Guaranty Company (USF & G), the insurer of the NOAB vehicle.
The trial court found the NOAB liable for Mr. Manzella's injuries under the doctrine of respondeat superior and awarded Mr. Manzella $74,826.20 for his personal injuries and property damage. The court of appeal reversed finding that the trial court was clearly erroneous in its decision.[2] The court reasoned that there was "no evidence to establish that the driver was acting within the course and scope of his employment at the time the accident occurred" and, thus, no liability under a theory of respondeat superior.[3] Additionally, the court found that since the "unknown driver did not have direct or implied permission to take the vehicle[,]" coverage did not exist under the omnibus clause contained in the USF & G policy. This court granted certiorari to review the correctness of this decision.[4]
The issue presented for our consideration is whether the driver of the NOAB vehicle was an omnibus insured under the USF & G policy.
In the present case, the USF & G policy contains the following omnibus clause by defining "who is an insured" as:
a. You [NOAB] for any covered "auto."
b. Anyone else while using with your permission a covered "auto" you own, hire, or borrow except:
(1) The owner or anyone else from whom you hire or borrow a covered "auto." This exception does not apply if the covered "auto" is a "trailer" connected to a covered "auto" you own.
(2) Your employee if the covered "auto" is owned by that employee or a member of his or her household.
(3) Someone using a covered "auto" while he or she is working in a business of selling, servicing, repairing or parking "autos" unless that business is yours.
(4) Anyone other than your employees, partners, a lessee or borrower or any of their employees, while moving property to or from a covered "auto."
(5) A partner of yours for a covered "auto" owned by him or her or a member of his or her household.
c. Anyone else who is not otherwise excluded under paragraph b above and is liable for the conduct of an "insured" but only to the extent of that liability.
At trial, Anthony J. Manzella, the plaintiff, sought to prove through circumstantial evidence that an NOAB employee had implied permission to use the NOAB vehicle. Mr. Manzella testified that he was driving on I-610 near the Elysian Fields off ramp when he was struck from the rear by a NOAB truck. The impact caused Mr. Manzella to black out momentarily. Mr. Manzella said *400 that after the accident, he and the driver of the NOAB truck drove their vehicles to the Chevron service station located at the base of the exit ramp. Mr. Manzella testified that the driver of the NOAB vehicle asked him whether they could "make a deal." Mr. Manzella declined the offer and the other driver fled in the NOAB truck. Then, according to Mr. Manzella, someone from the service station followed the NOAB truck which was forced to return to the station because of its damaged condition. Then, apparently the driver of the NOAB truck fled on foot. Mr. Manzella said that paramedics rendered medical assistance for his head injury. Mr. Manzella described the driver of the NOAB truck as being a little taller than himself, wearing slacks and a shirt. Mr. Manzella said that the other driver was not wearing a uniform or a name badge. Mr. Manzella identified Ramon Reece, an NOAB employee, from a photograph as the man driving the NOAB truck.
David Dawson, the cashier for the Chevron service station on Elysian Fields Avenue who was on duty on the date of the accident, testified that he thought that Mr. Manzella drove into the station to buy gasoline. Mr. Dawson admitted that he did not see the actual collision, but he heard the impact and, then, Mr. Manzella asked Mr. Dawson if he had seen "what happened." Immediately thereafter, the driver of the truck fled the scene on foot. Mr. Dawson allowed Mr. Manzella to use the telephone to call the police. Mr. Dawson called the manager of the station to inform him of the accident. Mr. Dawson could not accurately recall the color of the truck or whether the truck had any decals.
Ramon Reece the alleged driver of the NOAB truck was employed as an outside maintenance worker for the NOAB at the time of the accident. He testified that he left work at 4:00 p.m. on May 11, 1990 and did not return to the airport until he reported for work at 7:00 a.m. on May 12, 1990. Mr. Reece denied that he was involved in an accident on May 11, 1990 and stated that he did not have any personal knowledge of the accident. Mr. Reece stated that he learned about the accident of May 12, 1990 from Bryan Williams and Italo Giarelli, two airport maintenance division employees. Mr. Reece stated that some of the maintenance trucks occasionally left the airport premises to pick up parts between the hours of 8:00 a.m. and 4:00 p.m. However, permission from a supervisor was required prior to taking any vehicle off of the airport premises.
Arthur Sander, an NOAB air field maintenance division employee, testified that his division has approximately 100 vehicles and twenty four trucks, including the truck involved in the present accident. He learned about the accident at about 9:00 a.m. on May 12th when he received telephone calls from co-workers Chris Hyzy and Italo Giarelli. According to Mr. Sander, at the time of the accident, air field maintenance vehicles were not permitted off of airport premises and were parked in the maintenance yard or at one of the two maintenance shops when they were not in use. Mr. Sander recalled that on the night before the accident the relevant vehicle was locked and parked in front of one of his shops. Mr. Sander described the truck as an Omaha orange 1989 Chevrolet pick up truck that was used by the airfield maintenance division on the runway. To use the vehicle, an NOAB employee had to obtain permission from Mr. Sander or his superior. Mr. Sander testified that on the night of the accident no one sought that permission and no one was given that permission. Mr. Sander testified that no one ever had permission to take the truck off of airport grounds. Moreover, Mr. Sander said that there was no reason for an orange NOAB maintenance truck to be on the I-610 near Elysian Fields at approximately 5:22 a.m. on a Saturday morning.
According to Mr. Sander, there were four sets of keys for the truck. Mr. Sander kept a set of keys in his office which remained locked when he was not at work. Italo Giarelli, Mr. Sander's assistant, kept a set of keys in a metal lock box in his office which is adjacent to Mr. Sander's office. The third set of keys was kept by Bryan Williams, an NOAB air maintenance employee, in his locker. Chris Hyzy, an NOAB operational office employee, kept the fourth set of keys. Mr. Sander testified that all four sets of keys *401 were accounted for by approximately 10:00 a.m. on the morning of the accident. Mr. Sander acknowledged that if someone had taken a set of keys, they would have had time to return the keys before they were accounted for by Mr. Sander. Additionally, Mr. Sander said that he did not notice any evidence indicating that the vehicle may have been "hot wired."
Italo Giarelli, Mr. Sander's assistant, testified that he worked from 7:00 a.m. until 3:00 p.m. on Saturdays and he reported to work at approximately 7:00 a.m. on Saturday, May 12, 1990. According to Mr. Giarelli, maintenance division employees work an 8:00 a.m. to 4:00 p.m. shift Monday through Friday and are required to wear a uniform and name badge. About one or two hours after reporting for work, Mr. Giarelli was informed by Mr. Williams that the truck was missing. Shortly thereafter, Mr. Giarelli was told that the truck had been found and was being returned to the airport by a towing service. Mr. Giarelli testified that all of the employees in his division denied using the truck at the time of the accident. Moreover, no one had permission to use the vehicle.
Bryan Williams, acting supervisor for the NOAB maintenance division, testified that he parked the truck in front of the maintenance shop, locked the doors and rolled up the windows before he left work on May 11, 1990. He noticed that the truck was not in front of the shop when he reported to work the next morning at 7:00 a.m., so he informed Mr. Giarelli. Mr. Williams said that the orange airport trucks were never allowed off of the airport premises and he did not know of any reason for the truck to be off of the airport premises.
Chris Hyzy, an NOAB assistant operations supervisor at the time of the accident, testified that the operations division was only authorized to use the NOAB maintenance division truck for emergencies and to perform airfield inspections if the operation division vehicles were not functioning. However, the operations division needed permission from the maintenance division prior to using a maintenance division vehicle for any reason. Moreover, no one was ever granted permission to take a vehicle off of the airport premises. According to Mr. Hyzy, the operations division did not need the maintenance division truck on the date the accident occurred. When Mr. Hyzy learned the location where the NOAB truck had been found he believed that it had been stolen.
The accident was investigated by Wyett Frazier, an officer with the New Orleans Police Department. When Officer Frazier arrived at the scene the two vehicles were located at the Chevron service station near the Elysian Fields Avenue exit. The officer observed body damage on the front right side of the NOAB truck and on the left side of Mr. Manzella's vehicle. Officer Frazier testified that, after inspecting the NOAB vehicle, he did not notice broken windows or evidence of tampering with the steering column.
Finally, Kenneth Decareaux, a patrolman for the Kenner police at the time of the accident, said that he received a call from the airport regarding an NOAB stolen vehicle that had been recovered in New Orleans. Apparently, the New Orleans Police Department reported to NOAB that their vehicle had been involved in an accident, so an airport supervisor went into the office of the Kenner Police Department to file a stolen vehicle report. Mr. Decareaux could not recall whether the windows on the NOAB truck had been broken or whether there was evidence that the NOAB truck had been hot wired.

IMPLIED PERMISSION
Under an automobile liability insurance policy provision referred to as an "omnibus clause," insurance coverage is expanded to include persons who are using the insured's vehicle with the insured's express or implied permission. In Louisiana, such insurance coverage is statutorily mandated for policy holders and those who post security as proof of financial responsibility. See Aisole v. Dean, 574 So.2d 1248, 1251 (La.1991). Specifically, La.R.S. 32:900 requires all motor vehicle liability policies to include an omnibus clause which insures the person named therein and "any other person, as insured, using any such motor vehicle or motor vehicles with the express or implied permission *402 of such named insured...." La.R.S. 32:861(B) requires a person who posts a motor vehicle liability bond to satisfy "[a]ll judgments rendered against him or any person responsible for the operation of the obligor's motor vehicle with his express or implied consent...."
In the seminal case of Parks v. Hall, 189 La. 849, 181 So. 191 (1938), this court addressed what constitutes permission in an omnibus clause and adopted the "initial permission" rule. Under this rule, once consent, express or implied, is granted by the insured to use the vehicle, any subsequent changes in the character or scope of the use do not require additional specific consent of the insured. Norton v. Lewis, 623 So.2d 874, 875 (La.1993). Thereafter, "coverage will be precluded only where the deviation from the use consented to amounts to theft or other conduct displaying an utter disregard for the return or safekeeping of the vehicle." Id, There are at least three justifications for this rule: (1) "it effectively furthers the state's policy of compensating and protecting innocent accident victim[s] from financial disaster[,]" (2) the rule "serves to discourage collusion between lender and lendee in order to escape liability[,]" and (3) the rule "greatly reduce[s] a most costly type of litigation." Id.
The plaintiff has the burden of proving the fact of initial use with express or implied permission of the insured to make coverage effective under the omnibus clause. Francois v. Ybarzabal, 483 So.2d 602, 605 (La.1986); Perkins v. McDow, 615 So.2d 312 (La.1993). Moreover, the fact of initial permission must be proved by a preponderance of the evidence without the aid of any presumptions. Norton, 623 So.2d at 876. Generally, implied permission "arises from a course of conduct by the named insured involving acquiescence in, or lack of objection to, the use of the vehicle." Francois, 483 So.2d at 605.
Here, the trial court found that the keys were locked up or in the hands of an employee at all times; that the truck involved in the accident was not "hot wired;" and that the truck was operated with a key at the time of the accident.
The evidence showed that the truck was driven from the maintenance yard without windows being broken and without being "hot wired." Moreover, there was no other evidence of a possible theft of the vehicle such as tampering with the steering column. Therefore, it was reasonable to infer that the driver operated the truck with a key and that the Board allowed him to have access to the truck and to one of the four keys. Moreover, Mr. Manzella identified Ramon Reece, an NOAB employee as the driver of the truck, an identification which was apparently accepted by the trial judge. Mr. Reece testified that at times he was allowed to drive the truck off the airport grounds. The identification of Mr. Reece as the driver is supported by the fact that it was evident that the driver was well acquainted with other maintenance division Board employees, since he was permitted to drive off the premises through a gate manned by a security guard. Under these circumstances, we find that the driver of the NOAB truck left the airport premises with the implied initial permission of the Board.
This permission continued to exist at the time of the accident, since there was no evidence that this permission was subsequently rescinded. Insurance coverage is designed, in part, to protect innocent accident victims. The initial permission rule was adopted by this court to further this state policy. The initial permission rule extends omnibus insurance coverage to those persons who operate a vehicle with the express or implied consent of the insured. As previously discussed, one justification for this rule is that it prevents collusion between the lender and the lendee to avoid liability. In light of the evidence presented, plaintiff proved by a preponderance of the evidence that the NOAB employee driving the truck at the time of the accident had implied permission of the owner to use the truck and, therefore, was an omnibus insured under the Board's policy issued by USF & G. The court of appeal erred in concluding otherwise.

*403 DECREE
For the reasons assigned, the judgment of the court of appeal reversing the trial court's judgment is hereby reversed and the judgment of the trial court in favor of Mr. Manzella is reinstated.
MARCUS, J., dissents and assigns reasons.
VICTORY, J., dissents for the reasons assigned by MARCUS, J.
MARCUS, Justice (dissenting).
I find no evidence that the driver of the NOAB truck had the implied consent of the Board either at the time he left the airport premises or at the time of the accident. Accordingly, I respectfully dissent.

ON APPLICATION FOR REHEARING
PER CURIAM.
On application for rehearing, the New Orleans Aviation Board and its insurer raise two issues. First, the Board argues that factual errors in this court's opinion would have produced a different result if accurately presented. We deny rehearing as to that issue.
Second, the Board argues that its assignment of error with respect to damages was never considered by the appellate court, because of that court's reversal of the trial court's judgment on liability, and that this court should have remanded the case to the trial court for such a review. We agree that this court, upon reversing the judgment of the court of appeal and reinstating the judgment of the trial court on liability, should have remanded the case to the court of appeal for consideration of the issue of damages.
Accordingly, the application for rehearing is granted in part, and the case is remanded to the court of appeal to consider the assignment of error on damages, an issue not previously reached by the court of appeal. Otherwise, the application is denied.
NOTES
[1] Judge Henry L. Yelverton, Court of Appeal, Third Circuit sitting by assignment in place of Justice James L. Dennis.

Watson, J. not on panel. Rule IV, Pt. 2, § 3.
[2] 93-2492 (La.App. 4th Cir. 10/27/94), 644 So.2d 1167.
[3] During oral argument before this court, counsel for plaintiff conceded the issue of vicarious liability under the doctrine of respondeat superior and admitted that liability, if it exists, depended upon the existence of permission to use the NOAB truck.
[4] 94-2854 (La. 2/17/95), 650 So.2d 246.