# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 05-1616


**CHARLES E. SLAIN, JR., ET AL.**

**VERSUS**

**CARNELL J. THOMAS, ET AL.**


**\*\*\*\*\*\*\*\*\*\***


APPEAL FROM THE
SEVENTH JUDICIAL DISTRICT COURT
PARISH OF CONCORDIA, NO. 39668
HONORABLE LEO BOOTHE, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**MARC T. AMY**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Marc T. Amy, and Michael G. Sullivan, Judges.

**REVERSED AND DISMISSED IN PART. RENDERED.**


**Johnnie L. Matthews**
**Matthews & Matthews**
**4705 Bluebonnet Boulevard, Suite A**
**Baton Rouge, LA 70809**
**(225) 296-1115**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
  **Charles E. Slain, Jr.**
  **Brenda Slain**
  **John Delaney**
  **Magnolia Washington**

**Byron A. Richie**
**Richie, Richie & Oberle, L.L.P.**
**Post Office Box 44065**
**Shreveport, LA   71134**
**(318) 222-8305**
**COUNSEL FOR DEFENDANT/APPELLANT:**
       **Imperial Fire and Casualty Insurance Company**

**Tracy L. Oakley**
**Post Office Box 1867**
**Ruston, LA   71273-1867**
**(318) 255-4110**
**COUNSEL FOR DEFENDANT/APPELLEE:**
       **Safeway Insurance Company**

AMY, Judge.

The plaintiffs were involved in a car accident when the truck driven by the defendant struck the plaintiff's car in the rear. The plaintiffs filed suit against the defendant, the truck owner's liability insurer, and the driving plaintiff's uninsured/underinsured motorist carrier. Following a bench trial, the trial court found the defendant solely responsible for causing the accident. The trial court determined that the truck owner gave the defendant permission to use his vehicle; thus, his liability policy provided coverage to the defendant. The truck owner's liability insurer was ordered to pay damages subject to the extent of its liability policy limit and property damages for the plaintiff's vehicle. It appeals this judgment, asserting two assignments of error. For the following reasons, we reverse and dismiss in part, and render.

**Factual and Procedural Background**

The record indicates that on October 31, 2003, Carl White and Carnell Thomas traveled from Baton Rouge, Louisiana to New Orleans, Louisiana. According to White, he decided to go to New Orleans for Halloween, and he asked Thomas to accompany him, to which Thomas agreed. White drove his pickup truck to New Orleans, and the two spent the day visiting with friends, riding around, and "enjoying [them]selves." It was getting late, so White and Thomas decided to spend the night in New Orleans. According to White's deposition testimony, Thomas woke up the next morning and he asked White to bring him by a friend's house. White consented, and he testified that on route to Thomas' friend's house, Thomas asked him questions about his truck, "like how it was running and everything like that, if it was a good truck."

When White and Thomas reached their destination, Thomas exited the truck, knocked on the door, and talked to his friend. White remained in the truck. After speaking with his friend, Thomas entered the truck and asked White for the keys. White testified that when he refused to relinquish his keys, he and Thomas "started to fight, and the next thing you know his friend came out and shot me." White stated that because he was "too busy fighting" with Thomas, he did not know where Thomas' friend was when he shot him.

White was shot twice in the abdomen. When asked what happened after he was shot, White answered: "Then they told me get out of the truck. Well, I was in the driver's seat, and so I just pulled off. I just took off because I was taking the truck with me, and I was driving trying to get to the hospital." Thomas was still in the vehicle with White. White testified that on the way to the hospital, he became drowsy and was losing consciousness and blood. He recalled the conversation that he and Thomas had in the truck:

> He [Thomas] kept on asking me, "Let me drive, let me drive. You're going to kill us both." And I was telling him, "No, no." And then I got so drowsy, I mean, I was about to die. So, I mean, I just said okay, you know, because I couldn't make it no more. I'd drove enough, and I couldn't make it no more with driving, so I let him drive."

Upon his arrival at the hospital, White lost consciousness or as he states "fell out." He "woke up in the hospital, and [he] was in the bed, and everything was over." He testified that after being in the hospital for a couple of days, he began to wonder where his truck was. Weeks passed before White's truck was located. His mother, Kathy White, told him that his truck was involved in an accident.

The record indicates that after Thomas drove White to the hospital, he left in White's truck. On November 23, 2003, Thomas was involved in a motor vehicle

accident in Ferriday, Louisiana. Thomas rear-ended a vehicle driven by Charles Slain, Jr. Slain and his three passengers were allegedly injured as a result of the accident, and they instituted this suit for damages. Named as defendants were Thomas, White, White's liability insurer, Imperial Fire & Casualty Insurance Company (Imperial), and Slain's uninsured/underinsured motorist carrier, Safeway Insurance Company (Safeway).

A trial was held on May 23, 2005,[1] in which the trial court found Thomas wholly at fault in causing the accident.[2] The trial court concluded that "Defendant Thomas was given permission by Defendant White to use the vehicle insured by Imperial, and therefore, the liability policy issued by Imperial shall apply to this accident." The trial court awarded the plaintiffs $49,109.49 in damages and ordered that Imperial pay damages subject to the extent of its liability policy limit, twenty thousand dollars ($20,000.00), plus judicial interest and costs. Imperial was also ordered to pay $1,486.00 for the property damage to Slain's vehicle. Safeway was cast in judgment for its policy limits of $20,000.00.[3]

Imperial appeals, designating as error the following assignments[4]:

A.    Whether the trial court was manifestly erroneous/clearly wrong in concluding that "permission" existed where Carl White acquiesced to Carnell Thomas' driving him to the hospital while bleeding to death from two bullet wounds received to his abdomen as the result of a car jacking instigated by Carnell Thomas and an unknown associate; and that Carnell Thomas did not deviate from said "permission" when he left Carl White in the hospital with gunshot wounds and drove the insured vehicle one

_____

[1] One of the plaintiffs was not present for trial; therefore, his claim was dismissed.

[2] The trial court held that White was not negligent. Thomas "could not be served at the address provided and, therefore, was not made a party to this litigation."

[3] Prior to the lodging of the record in this court, Safeway Insurance Company settled with the plaintiffs.

[4] The issues of liability and medical causation have not been appealed.

3

hundred eighty miles away and was involved in an accident twenty-two days later.

B.      Whether the trial court erred in allowing a hearsay statement attributed to Carnell Thomas as an "excited utterance" where no testimony was illicited [sic] establishing the declarent [sic] was under the "stress of excitement caused by" the motor vehicle accident which forms the basis of the lawsuit and which had occurred one hour before the alleged statement took place.

**Discussion**

*Initial Permission*

Imperial asserts that because White was shot, bleeding, and losing consciousness, he acquiesced and allowed Thomas to drive him to the hospital. It argues that given the circumstances, the trial court erred in finding that White gave Thomas permission to leave the hospital in his truck and drive one hundred eighty miles away. Imperial, therefore, contends that its liability policy does not provide coverage as "the deviation from the use consented to amounts to theft or other conduct displaying utter disregard for the return or safekeeping of the vehicle."

Louisiana Revised Statutes 32:900(B)(2) provides that a motor vehicle liability policy:

> Shall insure the person named therein and any other person, as insured, using any such motor vehicle or motor vehicles with the express or implied permission of such named insured against loss from the liability imposed by law for damages arising out of the ownership, maintenance, or use of such motor vehicle or motor vehicles[.]

The type of "omnibus clause" required by La.R.S. 32:900(B)(2) is reflected in the Imperial policy. In part, the policy provides:

> **LIABILITY INSURANCE**
> . . . .
> **Protection for Others**
>       Any individual person using, with **your** express or implied permission, a **car we** insure, has the same rights and obligations that **you** have under this insurance.

4

. . . .

**Exclusions**

There are some situations **we** do not insure and for which **we** will not pay. These are as follows:

. . . .

**We** do not insure anyone using **your car** without **your** express or implied permission.

The omnibus clause is applicable if White, as the owner of the vehicle and the named insured, gave Thomas permission, express or implied, to drive his truck. *Manzella v. Doe*, 94-2854 (La. 12/8/95), 664 So.2d 398. It is undisputed that White granted Thomas permission to drive him to the hospital. Therefore, the pertinent issue before this court is whether the permission given on November 1, 2003, the day White was shot, continued until November 23, 2003, the date of the motor vehicle accident.

In *Norton v. Lewis*, 623 So.2d 874, 875 (La.1993), the supreme court explained the "initial permission" rule:

> Once permission, whether express or implied, to use a motor vehicle is established it is given a wide and liberal meaning in determining coverage. So long as the initial use of the vehicle is with the consent, express or implied, of the insured, any subsequent changes in the character or scope of the use do not require additional specific consent of the insured; coverage will be precluded only where the deviation from the use consented to amounts to theft or other conduct displaying utter disregard for the return or safekeeping of the vehicle.

In addressing the question of permissive use in its reasons for judgment, the trial court stated briefly that: "[T[his Court finds that Defendant Thomas was given permission by Defendant White to use the vehicle insured by Imperial, and therefore, the liability policy issued by Imperial shall apply to this accident." Whether or not permissive use exists is a factual finding that will not be overturned on appeal absent manifest error. *Tross v. Windsor Ins. Co.*, 98-617 (La.App. 5 Cir. 1/26/99), 726 So.2d

5

459. Having reviewed the record, we find that the trial court's factual finding in this regard is manifestly erroneous.

Upon his release from the hospital, White gave a deposition which was entered into evidence. White testified that when he moved to Baton Rouge to live with his brother, he did not know anyone. Thomas' family lived in the same building as White, and Thomas lived in the neighborhood. He testified that he first met Thomas[5] in October 2003, and they "just started" talking. Although he only knew Thomas for a couple of weeks, White asked him if he wanted to go to New Orleans with him. White testified that he drove his truck to New Orleans and that prior to this incident, Thomas had never driven his truck.

White and Thomas spent the night in New Orleans. The following morning, Thomas asked White to bring him to his friend's house, which he did. White testified that after Thomas spoke with his friend, he entered the vehicle and asked White for the keys; White refused. A fistfight ensued, and White was shot twice in the abdomen, allegedly by Thomas' friend. White remembered that Thomas and his friend told him to get out of the truck. Because he was seated in the driver's seat, White "just pulled off[,]" attempting to drive himself to the hospital.

On the way to the hospital, White was losing blood, getting drowsy, and "was about to go to sleep and wreck[.]" He testified that Thomas was telling him, "Let me drive, let me drive. You're going to kill us both." Because of his condition, White acquiesced. White estimated that when he gave Thomas permission to drive, the hospital was approximately three blocks away.

---

[5] White only knew Thomas by his first name, Carnell.

6

Upon arrival at the hospital, White lost consciousness and did not wake up until approximately four days after the shooting. He testified that when he woke up, he tried to locate his truck. When questioned about Thomas' "taking" of his truck, White responded:

> He never returned it, never called or anything, never returned the truck to my brother or anything of that manner. That's how come I was going to go and put it down for stolen, but I couldn't because I was in the hospital, and he was involved in a case that with me getting shot, because that's why the people wouldn't talk to me mainly because the hospital didn't want to get involved in it.

Although Thomas brought White to the hospital, the record does not state whether he remained for a period of time to inquire about White's condition. Rather Thomas drove White's truck for three weeks before he was involved in a motor vehicle accident in Ferriday, which according to White, is one hundred eighty miles away from New Orleans. Because Thomas drove the vehicle for an extended period of time and to a location which exceeded White's alleged initial permission, we find that this constitutes an "utter disregard for the return of the vehicle." *Cf. Pope v. Allstate Ins. Co.*, 99-494, p. 6 (La.App. 5 Cir. 11/30/99), 751 So.2d 299, 302 (because the accident occurred on the same day permission was granted and the defendant "did not attempt to steal the van or keep it for an extended period of time for his own personal use[,]" this did not amount to an utter disregard for the return or safekeeping of the vehicle).

We are mindful of the fact that prior to the shooting, Thomas attempted to take the car from White. It appears that White allowed Thomas to drive his truck for the *sole* purpose of getting him to the hospital. We note that it was impossible for White to revoke any permission given, because when he arrived at the hospital, he lost consciousness and did not wake up until days later. There is no indication that

White's acquiescence in letting Thomas drive extended beyond the arrival at the hospital. Beyond that point, Thomas was nowhere to be found. The record indicates that both White and his mother tried unsuccessfully to get the police to report the truck as stolen.

Given the circumstances, "deviation from the use consented to amounts to theft or other conduct displaying utter disregard for the return or safekeeping of the vehicle." *Norton*, 623 So.2d at 875. Accordingly, the trial court's determination that Imperial's liability policy extended coverage to Thomas is manifestly erroneous.

Due to this finding, we deem it unnecessary to address Imperial's remaining assignment of error.

## DECREE

For the above reasons, the judgment of the trial court is reversed insofar as it found the appellant, Imperial Fire & Casualty Insurance Company, provided coverage for the plaintiffs' damage. Accordingly, the claim against Imperial Fire & Casualty Insurance Company is dismissed with prejudice. Costs of this proceeding are assigned to the plaintiffs-appellees, Charles Slain, Belinda Slain, and Magnolia Washington.

**REVERSED AND DISMISSED IN PART. RENDERED.**