771 So.2d 175 (2000)
Steve BLACKBURN, et al.
v.
NATIONAL UNION FIRE INSURANCE CO. OF PITTSBURGH.
Steve and Wendi Royer
v.
Scafco, Ltd., et al.
Nos. 99-1872, 99-1873.
Court of Appeal of Louisiana, Third Circuit.
August 23, 2000.
Writ Granted November 27, 2000.
Writs Denied November 27, 2000.
*177 David O. Walker, Neblett, Beard & Arsenault, Alexandria, Louisiana, Counsel for Plaintiffs/Appellees.
Michael J. McNulty, III, Plauche, Smith, & Nieset, Lake Charles, Louisiana, Counsel for Defendant/Appellee, State Farm Mutual Automobile Ins. Company.
Thomas E. Balhoff, Judith R. Atkinson, Roedel, Parsons, Koch, Frost, Balhoff & McCollister, Baton Rouge, Louisiana, Counsel for Defendant/Appellant National Union Fire Insurance Company of Pittsburgh, Pennsylvania.
Court composed of Judge OSWALD A. DECUIR, Judge MICHAEL G. SULLIVAN, Judge GLENN B. GREMILLION.
GREMILLION, Judge.
This appeal arises out of a rear-end collision involving a truck leased by Scafco Limited and insured by National Union Fire Insurance Company of Pittsburgh under an insurance policy issued to Scafco's parent company, Turner Industries. At issue in this appeal is whether the trial court correctly granted a summary judgment in favor of the plaintiffs, Steve and Marissa Blackburn and Steve and Wendi Royer, setting the policy limits of the National Union insurance policy at $1,000,000. For the following, reasons we affirm in part and reverse in part.

FACTS AND PROCEDURE
At approximately 1:40 a.m. on Christmas morning 1997, Charles Rials Jr. left a party in a truck owned by Wheels Incorporated, leased to his employer, Scafco, and insured under a policy issued to Turner. The truck had been entrusted to him the day before by his supervisor, Steve Clark. The Blackburns and their guest passengers, the Royers, were attending the same party and left the party just before Rials. The Blackburn vehicle was stopped at an intersection when it was rear-ended by the truck Rials was driving.
As a "perk," Scafco permanently assigned company vehicles to its supervisors for use in driving to and from work. Clark, however, was a temporary Scafco supervisor. His access to the Scafco truck fluctuated with the amount of business Scafco acquired. When Scafco was busy and needed an additional supervisor, Clark was elevated from foreman to supervisor and temporarily granted permission to use a Scafco vehicle by Scafco manager, Jackie Stone. When business slowed, Clark would return the truck to Stone and resume his position as foreman. When Clark was performing the duties of a supervisor, he was not permanently assigned a truck as were the other Scafco supervisors; however, he was allowed to use a "yard truck." A yard truck is a truck that is assigned to each plant cite and is available *178 for use by Scafco employees for such tasks as running errands at the plant site, picking up equipment and materials, and transporting workers.
In December 1997, Clark was functioning as a supervisor and was allowed use of the yard truck. Rials was involved in an alcohol-related accident one to two months before the accident at issue and relied on Clark for transportation to work. Rials was scheduled to work Christmas Day and Clark had taken that day off, so Rials accompanied Clark home after work on Christmas Eve and drove the truck home so he could drive it to work the next day. Additionally, the truck would be available for work-related activities in its regular capacity as a yard truck.
On that evening, Rials used the Scafco vehicle to drive to the Iron Horse Pub in DeQuincy, where he drank beer from approximately 8:00 to 10:30 p.m. He then drove to a Christmas Eve party at the home of Clark's uncle. Rials arrived at the party at approximately 10:45 p.m. and continued drinking until he left at approximately 1:30 a.m., shortly after the Blackburns and Royers. Clark arrived at the party at approximately midnight and was still there at the time of the accident. While at the party, Clark and Rials spoke, but the topic of how Rials got to the party was not discussed.
Approximately ten minutes after Rials left the party, Clark was notified by an acquaintance that Rials had been involved in an accident in the Scafco truck. Clark immediately went to the scene where he found Rials intoxicated. Rials was charged with, and subsequently pled guilty to, driving while intoxicated and reckless operation of a motor vehicle. The following week Rials' employment was terminated because of his involvement in the accident.
The Blackburns and Royers filed suit against Wheels Incorporated, Scafco, Rials, and National Union for personal injury. The cases were ultimately consolidated. The National Union insurance policy which covered the Scafco vehicle contained two allegedly conflicting provisos. Endorsement # 005 purported to limit the policy to the statutory minimum required by state law in instances when an accident occurred while an employee was acting outside the course and scope of his employment or without the permission of his employer. Endorsement MCS-90 limited provisions found elsewhere in the policy for certain types of motor carriers, making the insurer liable for up to $1,000,000 in damages as a result of an accident.
National Union filed a motion for summary judgment asserting that under Endorsement # 005, the limits of liability coverage for Rials' accident were limited to $10,000 per person or $20,000 per accident. The Blackburns, the Royers, Rials, and State Farm opposed National Union's motion and filed a cross-motion contending that the National Union policy limits for the accident were $1,000,000 regardless of whether Rials was operating the vehicle outside of the course and scope of his employment.
Scafco and National Union moved for dismissal, asserting that Rials was acting outside the course and scope of his employment at the time of the accident and, therefore, Scafco was not vicariously liable for Rials' actions. The trial court granted the Cross-Motion for Summary Judgment finding that the National Union policy provided limits of $1,000,000 pursuant to the MCS-90 Endorsement. In granting the Blackburns and the Royers' motion, the trial court specifically held that "the policy of insurance issued by National Union... provides insurance coverage with policy limits of $1,000,000.00 for claims sued on in these consolidated matters." The trial court further found that Rials was not acting within the course and scope of his employment with Scafco at the time of the accident and, as such, dismissed all claims against Scafco premised on vicarious liability. However, the trial court reserved all rights of the Blackburns and the *179 Royers to pursue claims against Scafco under any other theory of liability.
In its oral reasons, the trial court stated that there was no material issue of fact regarding the following points: 1) Rials was not in the course or scope of his employment; 2) there was a policy providing $1,000,000 of coverage to Turner and that it included Scafco; 3) the MCS-90 Motor Carrier Endorsement included Scafco "as it was not identified not to include Scafco"; 4) there was a conflict in the MCS-90 endorsement and Endorsement # 005; and 5) a provision in Endorsement # 005 allowed Scafco to give permission to use company vehicles "separate and apart from the course and scope issues."
Pursuant to the foregoing conclusions, the trial court determined that Endorsement # 005 allowed an employee with permission to use a company vehicle outside the course and scope of employment. The trial court also found that Rials had permission to use the Scafco vehicle and that he was acting within the course and scope of that permission. Finally, the trial court determined that the failure of National Union or Turner to specify who and what the MCS-90 Endorsement covered made it ambiguous and, therefore, Scafco was covered under the Endorsement. National Union and Scafco timely appealed the trial court's granting of the Blackburns and the Royers' Cross-Motion for Summary Judgment.

SUMMARY JUDGMENT
Appellate courts review summary judgments de novo, applying the same criteria as the trial court in determining whether summary judgment is appropriate. Schroeder v. Board of Supervisors of Louisiana State Univ., 591 So.2d 342 (La.1991). Article 966(B) of the Louisiana Code of Civil Procedure provides that summary judgment shall be granted where the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there are no genuine issues of material fact and that the mover is entitled to judgment as a matter of law. Summary judgment declaring a lack of coverage under an insurance policy may not be rendered unless there is no reasonable interpretation of the policy, when applied to the undisputed material facts shown by the evidence supporting the motion, under which coverage could be afforded. Reynolds v. Select Properties, Ltd., 93-1480 (La.4/11/94); 634 So.2d 1180. Whether the written contract conformed to the intent of the parties as reflected in the resolution is a question of fact inappropriate for resolution in a motion for summary judgment. See Town of Mamou v. Fontenot, 99-1650 (La.4/12/00); 756 So.2d 719.
The mover has the burden of showing that no material issues of fact exist. La. Code Civ.P. art. 966(C)(2). To satisfy this burden, the mover must present supportive evidence that the motion should be granted. Once the mover establishes a prima facie showing, the burden of proof shifts to the nonmoving party to present evidence of the existence of issues of material fact which would preclude summary judgment. An adverse party may not rest on the pleadings, but must set forth, by affidavit or otherwise, specific facts showing that there is a genuine issue for trial. La. Code Civ.P. art. 967. "Only when reasonable minds must inevitably conclude that the mover is entitled to judgment as a matter of law on the facts before the court is a summary judgment warranted." Reynolds, 634 So.2d at 1183.

DISCUSSION
The parties' intent, as reflected by the words of the policy, determine the extent of coverage. La.Civ.Code art. 2045. When the words of a contract are clear, explicit, and lead to no absurd consequences, the contract must be interpreted within its "four corners" and cannot be explained or contradicted by parol evidence. La. Civ.Code art. 1848; Peterson v. Schimek, 98-1712, (La.3/2/99); 729 So.2d 1024. An insurance policy should not be interpreted in an unreasonable or a *180 strained manner so as to enlarge or to restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion. Reynolds, 634 So.2d 1180. A provision which seeks to narrow the insurer's obligation is strictly construed against the insurer; if the language of the exclusion is subject to two or more reasonable interpretations, the interpretation which favors coverage must be applied. Id. Subject to the above rules of interpretation, insurance companies have the right to limit coverage in any manner they desire, so long as the limitations do not conflict with statutory provisions or public policy. Ducote v. Koch Pipeline Co., L. P., 98-0942 (La.1/20/99); 730 So.2d 432. It is only when an exclusion is subject to two or more reasonable interpretations, that a court should apply the interpretation which favors coverage. Reynolds, 634 So.2d 1180.
The trial court held that Scafco was covered under the MCS-90 endorsement because it was not specifically excluded under that endorsement, and that Endorsement # 005 "allow[ed] the company to give permission to use the vehicle separate and apart from the course and scope issue."
National Union claims that the MCS-90 Endorsement is not applicable to Scafco and, thus, the trial court's determination that the MCS-90 conflicts with Endorsement # 005 is erroneous. Therefore, they assert that the course and scope of employment limitation of Endorsement # 005 should be controlling, given the trial court's finding that Rials was acting outside the course and scope of his employment. After carefully examining the trial court's oral reasons, we cannot determine whether it found a policy limit of $1,000,000 because it concluded that Scafco came under the umbrella of the MCS-90 Endorsement, or whether it found that the $1,000,000 general policy limits applied because it concluded that Endorsement # 005 allowed for the granting of permission to use a company vehicle outside the course and scope of employment, and Rials was acting within the scope of that permission.
The National Union insurance policy has $1,000,000 general policy limits and reads in pertinent part, "We will pay all sums an `insured' legally must pay as damages because of `bodily injury' or `property damage' to which this insurance applies, caused by an `accident' in resulting from the ownership, maintenance, or use of a covered `auto.'" The National Union policy had three relevant endorsements for the purposes of the case at bar. Endorsement # 002 was entitled "BROAD FORM NAMED INSURED ENDORSEMENT," and changed the term "Named Insured" to include any subsidiary corporation of Turner, of which Scafco is included. Also included in the National Union policy was an "ENDORSEMENT FOR MOTOR CARRIER POLICIES OF INSURANCE FOR PUBLIC LIABILITY UNDER SECTIONS 29 AND 30 OF THE MOTOR CARRIER ACT OF 1980" (MCS-90 Endorsement), which read in pertinent part:
This insurance is primary and the company shall not be liable for amounts in excess of $1,000,000 for each accident.
. . . .
The insurance policy to which this endorsement is attached provides automobile liability insurance and is amended to assure compliance by the insured within the limits stated herein, as a motor carrier of property, with Sections 29 and 30 of the Motor Carrier Act of 1980 and the rules and regulations of the Federal Highway Administration (FHWA) and the Interstate Commerce Commission (ICC).
[T]he insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 *181 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere. Such insurance as is afforded, for public liability ....
The Motor Carrier Act of 1980 requires limits of financial responsibility according to the type of carriage and commodity transported by the motor carrier.
(Emphasis added).
The current statutory provisions regarding inclusion of the MCS-90 Endorsement are found at 49 U.S.C. § 13906. The regulations adopted pursuant to those statutes are found at 49 C.F.R. § 387. These statutes and regulations require certain classes of transportation effectuating entities to maintain liability insurance with certain minimum limits, and that such insurance policies contain the MCS-90 Endorsement. "The purpose of these regulations is to create additional incentives to motor carriers to maintain and operate their vehicles in a safe manner and to assure that motor carriers maintain an appropriate level of financial responsibility for motor vehicles operated on public highways." 49 C.F.R. § 387.1. It is clear from the wording of the MCS-90 Endorsement, as well as the enacted regulations, that the legislation is directed at motor carriers. Motor carriers are defined as:
[A] for-hire motor carrier or a private motor carrier. The term includes, but is not limited to, a motor carrier's agent, officer, or representative; an employee responsible for hiring, supervising, training, assigning, or dispatching a driver; or an employee concerned with the installation, inspection, and maintenance of motor vehicle equipment and/or accessories.
49 C.F.R. § 387.5
For the purpose of regulation by the Department of Transportation there exists three different types of motor carriers: motor common carriers, motor contract carriers, and motor private carriers. Common carriers are those that hold themselves out to provide transportation of persons or property for the general public. 49 U.S.C. § 10102(14). Contract carriers are those that provide transportation for persons or property in accord with continuing agreements. 49 U.S.C. § 10102(15). Private carriers are those that are neither common nor contract carriers, and that "transport property by motor vehicle" in interstate commerce, are the "owner, lessee, or bailee of the property," and transport the property "for sale, lease, rent or bailment, or to further commercial enterprise." 49 U.S.C. § 10102(16). Motor carrier as used in the Motor Carriers Act only contemplates motor common carriers and motor contract carriers. 49 U.S.C. § 10102(13). Thus, motor private carriers do not fall under the Act and, as such, are not required to include MCS-90 Endorsements in their liability insurance policies.
In the case at bar, substantial testimony revealed that the Scafco truck involved in the accident used substantially and primarily for hauling employees and equipment around self-contained plant sites. When the truck left the plant site, it was used to run personal errands of the employees, such as retrieving food items and the like. While Clark was an acting supervisor, the truck was used by him for transportation to and from work and to run personal errands. The Blackburns and the Royers contend that the testimony revealed an occasion where the vehicle was used to travel to a job site in Texas and that interstate roads must have been used in the trip; therefore, the vehicle is required to carry the MCS-90 Endorsement. National Union contends that the MCS-90 endorsement is part of the Turner liability policy because Nichols Construction, not Scafco, falls under the definition of "motor carrier" as contemplated by the Motor Carrier Act.
*182 We find that the Scafco truck does not engage in the type of transportation that would bring it under the definition of a motor carrier, thus, it does not require liability insurance pursuant to a MCS-90 Endorsement. Based on the record, the Scafco vehicle was used to transport property to further Scafco's commercial enterprise of scaffold building. It did not provide transportation of persons or property for the general public, nor did it provide transportation for persons or property in accord with continuing agreements. What Scafco transported was in furtherance of its commercial enterprise of scaffold building. The truck in question was used to transport the scaffold building materials and scaffold builders within the plant sites, primarily in the Lake Charles area. Scafco most closely resembles a private carrier. The truck was leased by Scafco and was used to further its commercial enterprise of scaffold building, and was overwhelmingly, and almost to the point of exclusivity, used within the State of Louisiana on private work sites. As the Scafco truck in question does not comport with the type of usage required to make it a common carrier, as contemplated by the MCS-90 Endorsement, we find the trial court's determination that there was ambiguity as to whether the vehicle was covered by the MCS-90 endorsement erroneous.
Endorsement # 005 read as follows:
AUTOMOBILE LIMITATION OF COVERAGE
THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY
THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:
It is agreed that the following condition applies to this policy.
The most that we will pay on behalf of anyone using a coverage [sic] auto outside of the scope of the permission of the Named Insured or on behalf of anyone using a covered auto outside of the course and scope of that person's employment with the Named Insured is the statutory minimum financial responsibility limit of the state having jurisdiction, but only if that person using a covered auto is an insured as defined herein, and only if coverage is provided.
National Union asserts that the only relevant and material fact pertinent to the insurance limits question is that Rials was acting outside the course and scope of his employment at the time the accident occurred. We disagree. Endorsement # 005 specifically implied that permission could be given to use a company vehicle outside the course and scope of employment. It states, "The most that we will pay on behalf of anyone using a coverage [sic] auto outside of the scope of the permission of the Named Insured or on behalf of anyone using a covered auto outside of the course and scope of that person's employment...." (Emphasis added). In its oral reasons, the trial court recognized that Endorsement # 005 allowed an employee to be empowered with the authority to use a company vehicle outside the course and scope of employment. As noted previously, it is unclear whether the trial court's ruling was based on its determination that MCS-90 was ambiguous relative to who was insured and construed the ambiguity against the insurer, or because it found that Endorsement # 005 provided that permission could be granted and that Rials was vested with that permission, thus, bringing him under the $1,000,000 coverage of the general policy.
Since we have found that the MCS-90 endorsement does not apply, we shall now address whether Rials was granted permission to use the Scafco vehicle outside the course and scope of employment. Accordingly, we find that the trial court's determination that the # 005 Endorsement *183 provided that an employee could be granted permission to use a Scafco vehicle outside the course and scope of employment, that Rials was granted said permission, and that Rials was acting within the scope of that permission is supported by the law and record.
The language of the # 005 Endorsement is clear and unambiguous and anticipates instances in which an employee is given permission to operate a company vehicle outside the course of his employment. When operating a vehicle with permission of the insured, liability coverage of $1,000,000 under the general policy would be in force. A motor vehicle liability policy means:
[A]n owner's or an operator's policy of liability insurance, certified as provided in R.S. 32:898 or 32:899 as proof of financial responsibility, and issued except as otherwise provided in R.S. 32:899, by an insurance carrier duly authorized to transact business in this state, to or for the benefit of the person named therein as insured.
B. Such owner's policy of liability insurance:
. . . .
(2) Shall insure the person named therein and any other person, as insured, using any such motor vehicle or motor vehicles with the express or implied permission of such named insured
La.R.S. 32:900 (emphasis added).
[O]nce consent, express or implied, is granted by the insured to use the vehicle, any subsequent changes in the character or scope of the use do not require additional specific consent of the insured....
The initial permission rule extends omnibus insurance coverage to those persons who operate a vehicle with the express or implied consent of the insured.
Manzella v. Doe, 94-2854, pp. 6-7 (La.12/8/95); 664 So.2d 398, 402 (citation omitted).
The record is replete with evidence that Rials was granted permission to use the Scafco vehicle. There was testimony that Rials used the Scafco truck every weekend from the first weekend in November up until the accident. When Rials left work on Friday, Clark would give the truck to him so that he could visit his wife in Lake Charles. Rials would then return the truck to Clark's home on Saturday evening.
There was also testimony that Clark knew Rials frequented bars in the DeQuincy area while driving the Scafco truck, that Rials drove to a barbeque at Clark's camp in the Scafco truck, and that Clark allowed Rials and two other employees to use the truck in order to drive to a concert in Austin, Texas, some eighty miles from their job site in Bryan, Texas. Further, testimony revealed that Clark knew Rials was never instructed as to the rules or regulations regarding the use of Scafco vehicles, that he had a drinking problem, that he was not allowed to use his parents' car because he had damaged it in an alcohol-related accident, and that he totaled his own truck in an alcohol-related accident. On at least one occasion, Clark sought and received permission from a Scafco manager for Rials to use a Scafco truck to move furniture. The record also revealed that at least two other Scafco supervisors used Scafco trucks as their personal vehicles because they did not own vehicles. Further, on the night of the accident, Clark knew that Rials had the truck in his possession, that he was at the party, and that he was drinking. For the afore discussed reasons, we cannot say the trial court erred in determining that Rials had permission to use the Scafco truck and that he was acting within the scope of that permission. Thus, we find that there was no genuine issue of material fact regarding whether Endorsement # 005 allowed for the granting of permission to use a Scafco truck outside the course and scope of employment and that Rials was granted such permission. As such, we find that the *184 National Union policy limits applicable under the general policy are $1,000,000.

CONCLUSION
For the above reasons, the judgment of the trial court granting the Blackburns and Royers' Cross-Motion for Summary Judgment is reversed as it relates to the trial court's finding that the MCS-90 Endorsement of the National Union policy was applicable to Scafco, and affirmed as it relates to the trial court's determination that the general liability policy limits of $1,000,000 applied in that Rials had permission to use the Scafco truck and was acting within the scope of that permission. All costs are taxed against National Union Insurance Company of Pittsburgh.
AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.