NOT FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT


06-933


PHILLISA JACKSON, ETC.

VERSUS

STATE OF LOUISIANA, THROUGH THE DEPARTMENT
OF CORRECTIONS, ET AL.


**********

APPEAL FROM THE
TWELFTH JUDICIAL DISTRICT COURT
PARISH OF AVOYELLES, DOCKET NO. 2001-2752-B
HONORABLE WILLIAM J. BENNETT, DISTRICT JUDGE
**********

SYLVIA R. COOKS
JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, and
Elizabeth A. Pickett, Judges.


AFFIRMED.

Donald G. Cave
Cave Law Firm
3909 Plaza Tower Drive
Baton Rouge, LA  70816
(225) 292-3194
COUNSEL FOR PLAINTIFFS/APPELLANTS:
    Shawanna Hughes, Deandred Jackson, and Jarion Jackson

**Patricia Nalley Bowers**
**Special Assistant Attorney General**
**201 St. Charles Avenue**
**Suite 2504**
**New Orleans, LA 70170**
**(504) 522-3340**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **State of Louisiana, Through the Department of Corrections**

**Rodney Rabalais**
**P.O. Box 447**
**Marksville, LA 71351**
**(318) 445-3631**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Randy Normand, Angela Hardy, Rebecca Ferguson, Sherri Hunt**

**Mark L. Ross**
**600 Jefferson Street**
**Suite 512**
**Lafayette, LA 70501**
**(337) 266-2345**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Sheriff Bill Belt**

**Edwin L. Hightower**
**Powers & Hightower, LLP**
**7967 Office Park Blvd.**
**P.O. Box 15948**
**Baton Rouge, LA 70895**
**(225) 928-1951**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Scottsdale Insurance Co.**

**COOKS, Judge.**

The Plaintiffs appeal the trial court's judgment dismissing their suit alleging negligence and deliberate indifference on the part of the Defendants in failing to provide Phillisa Jackson with constitutionally mandated health care while in their custody. Scottsdale Insurance Company, the insurer for the Defendants, answered the plaintiffs' appeal, asserting the trial court erred in denying its motion for involuntary dismissal, based on exclusionary language in its policy. For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY

On October 20, 1995, the Winn Parish District Attorney's Office filed a Bill of Information alleging that Phillisa Jackson committed two offenses of distribution of cocaine. After an initial plea of not guilty on June 19, 1996, Ms. Jackson entered a plea of guilty and was sentenced to serve three years in the custody of the Louisiana Department of Corrections. On August 12, 1996, she was transferred to Avoyelles-Bordelonville Correctional Center (hereafter ABCC). She went through the standard intake procedure, including a medical physical which revealed a blood pressure reading of 148/98. According to Plaintiffs, the intake record was not placed in her medical chart, nor was her blood pressure ever taken again at ABCC.

Ms. Jackson remained in the custody of ABCC from August 12, 1996 through May 9, 1997. At points during her incarceration at ABCC, Plaintiffs allege Ms. Jackson complained among other things of headaches, abdominal pain, back pain, edema of her body, and an inability to urinate. The inmate request forms and nurses notes show that on several occasions she voiced to the nurses at ABCC requests to see a doctor. She was not examined by any doctor during her stay at this facility. Her blood pressure also was not monitored while in the custody of ABCC. Ms. Jackson,

at one point, sought the assistance of Randy Normand (the warden of ABCC), who denied her request for medical treatment.

According to the ABCC records, Ms. Jackson specifically began complaining of symptoms of edema on April 21, 1997. She was prescribed diuretics and seen again by the nurses on April 23, 29 and May 2 with continuing edema. On May 7, 1997, the nursing staff noted that her condition was not improving with medication, and she was scheduled for transport on May 9, 1997, to Huey P. Long Memorial Hospital. On May 9, 1997, Ms. Jackson was transported to Huey P. Long, where she was seen in the emergency room and diagnosed with "acute renal failure." After she was stabilized, Ms. Jackson was transferred to LSU Medical Center in Shreveport. At LSU Medical Center renal ultrasound and other specific testing indicated her renal failure was chronic, as opposed to the diagnosis of acute renal failure made at Huey P. Long. After her discharge from the LSU Medical Center on May 15, 1997, she was transferred to Louisiana Correctional Institute for Women in St. Gabriel, Louisiana. She remained there until her release from custody on August 2, 1997. Ms. Jackson ultimately lost function in both of her kidneys, and required dialysis treatments for the remainder of her life.

After her release, Ms. Jackson returned to Natchitoches Parish. On April 3, 1998, Ms. Jackson filed a Petition for Damages, individually and on behalf of her minor children, Jarion and Deandred Jackson, and major child, Shawanna Hughes. She named the following Defendants: State of Louisiana, Through the Department of Public Safety & Corrections (DPSC); Richard Stalder, the Secretary of DPSC; ABCC; Bill Belt, the Sheriff of Avoyelles Parish; Randy Normand, the then Warden of ABCC; Scottsdale Insurance Company (which provided an insurance policy covering Sheriff Belt and ABCC); Angela Hardy, the head nurse for ABCC; Rebecca

Ferguson and Sherri Hunt, nurses for ABCC. The petition was eventually amended to add the Avoyelles Parish Police Jury. Plaintiffs contended the Defendants failed to provide medical treatment to Ms. Jackson and/or failed to properly implement policies and procedures of ABCC concerning the care of inmates and as a result Ms. Jackson sustained personal injury.

The Police Jury filed an exception of no right of action and/or motion for summary judgment; Scottsdale filed a motion for summary judgment; and the DPSC and Secretary Stalder filed peremptory exceptions of no cause of action. The trial court denied the Police Jury's and Scottsdale's motions, but granted the exceptions as to the DPSC and Secretary Stalder. The trial court found Secretary Stalder had qualified immunity for discretionary functions under the two part test enunciated in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727 (1982). The trial court further found that DPSC enjoyed statutory immunity pursuant to La.R.S. 42:1441. Plaintiffs then filed a motion for new trial on the exceptions, which was denied. Plaintiffs then sought review at the first circuit court of appeal, which affirmed, finding that if DPSC cannot be held liable then neither can Secretary Stalder. *Jackson v. State, Through Dept. of Public Safety and Corr.*, 99-1707 (La.App. 1 Cir. 9/22/00), 771 So.2d 322 (not designated for publication). The Supreme Court then granted writs, *Jackson v. State, Through Dept. of Public Safety and Corrections*, 00-2882 (La.1/5/01), 777 So.2d 1237. While disagreeing with the first circuit's reasoning for the Secretary's immunity, the Supreme Court found Secretary Stalder was immune on the basis of qualified immunity for his discretionary function of deciding "DPSC policy for housing state prisoners in effort to satisfy the myriad of social and economic demands for sufficient adequate prison facilities." *Jackson v. State, Through Dept. of Public Safety and Corr.*, 00-2882, p. 9 (La. 5/15/01), 785 So.2d 803, 809. However, the

dismissal of DPSC was not upheld, and the case was returned to the lower court for further proceedings.

DPSC subsequently filed a motion for summary judgment in the lower court, which was heard and decided in its favor on August 20, 2004. On that date, Plaintiffs requested in open court that the judgment on DPSC's motion for summary judgment be severed and the court and parties agreed. The trial court's judgment, signed on November 3, 2004, reflected that agreement, and was a final judgment. The appeals period, both suspensive and devolutive, passed without any appeal filed by Plaintiffs.[1]

On January 26, 2004, Ms. Jackson died. Ms. Jackson's daughter, Shawanna Hughes, filed a Motion to Substitute Party Plaintiff on May 17, 2004. After a lengthy trial which began on July 27, 2005, the trial court allowed the record to remain open to accommodate plaintiffs' request to submit additional evidence. The court eventually issued its ruling on March 24, 2006, finding Plaintiffs failed to prove the Defendants' actions caused Ms. Jackson's renal failure. The court's lengthy reasons for judgment provided as follows:

> A review of the testimony and all exhibits reflects conclusively that upon her admission to Avoyelles Bordelonville Correctional Center Phillisa Jackson was not in good health. Her health failures were obviously a result of her lifestyle. The admission notes at Avoyelles Bordelonville Correctional Center reflect that Phillisa Jackson suffered from hearing loss, Sickle Cell Trait, and problems with her uterus. Upon admission to the women's facility at St. Gabriel it was noted that she had HIV-Aids. Phillisa Jackson confirmed in her testimony that her lifestyle included the use of illegal drugs, even at times through intravenous use. Thereupon, upon admission to Avoyelles Bordelonville Correctional Center Phillisa Jackson was in poor health. She displayed a slightly elevated blood pressure on that date, and although many witnesses indicated that this often is based on anxiety of entering a new institution, all medical experts agreed that Phillisa Jackson's blood pressure should have been monitored at Avoyelles Bordelonville Correctional Center after that date. Plaintiffs contend that

---

[1] Even though DPSC and Secretary Stalder have been dismissed from this matter, and the trial on the merits only included the Plaintiffs and the remaining defendants, DPSC and Secretary Stalder were mistakenly sent a notice of lodging and an order to brief the case.

the failure to monitor the blood pressure of Phillisa Jackson caused her Renal Failure.

The evidence adduced at trial also confirms without question that the staff at Avoyelles Bordelonville Correctional Center failed to follow the policy and procedure's manual written by Dr. L.J. Mayeux, the medical director. There are numerous instances wherein their own policies simply were not followed. Plaintiffs allege that these failures along with other matters amounted to deliberate indifference, and that this indifference contributed to the Acute Renal Failure suffered by Phillisa Jackson.

In Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285, the U.S. Supreme Court held that an inmate must rely on prison authorities to treat his medical needs and that accordingly, the authorities holding persons in custody have a constitutional obligation under the Eighth Amendment to provide adequate and reasonable medical attention and care to their incarcerated principles. Failure to provide medical care or improper medical care is actionable if same reflects a deliberate indifference. A prison official acts with deliberate indifference if he knows that an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. (**Farmer v. Brennan** 114 S. Ct. 1970) Deliberate indifference will be found only when the facts demonstrate intentional and wanton action on the part of the defendant. Disagreements between inmates and physicians as to what medical care is appropriate for his particular condition does not state a claim for deliberate indifference to medical needs. (**Norton v. Diamazana** 122 F. 3d. 286)

As stated above, plaintiffs have alleged that the defendants failed to provide adequate treatment and failed [to] properly implement their own policies and procedures. Plaintiffs allege that the case law cited above provides for a higher duty to provide care for inmates and that Phillisa Jackson was denied care upon request, stating that the defendants obviously did not think that Phillisa Jackson was sick enough to receive care. Plaintiffs allege cruel and unusual treatment in violation of the constitution.

The defendants allege even if there were some deficiencies of Avoyelles Bordelonville Correctional Center personnel, that the issue is simply whether or not the defendants' actions caused the kidney failure, stating that the issue of causation is the core of this case.

The first question is therefore, did the actions and/or failure to act committed by the defendants cause Jackson's Renal Failure? The answer to this question is - - - DEFINITELY NOT.

The evidence confirms more probable than not that when diagnosed in full Renal Failure on May 9, 1997 at Huey P. Long Medical Center in Pineville, Phillisa Jackson had "Chronic Renal

Failure." The word chronic means "long standing." Phillisa Jackson was admitted to Avoyelles Bordelonville Correctional Center on August 12, 1996 and diagnosed May 9, 1997, a period of approximately nine months. There is absolutely no evidence in the record to indicate that on August 12, 1996 Phillisa Jackson had symptoms and/or potential for Renal Failure. In fact, the expert testimony proves otherwise.

When diagnosed with full Renal Failure in May, 1997 one kidney of Phillisa Jackson had ceased function altogether and the other one was near total failure. All experts agree that patients in early stages of Renal Failure are "asymptomatic." All agreed that individuals become "symptomatic" when their kidneys are functioning at 15% or less of their capacity.

All experts agree that high blood pressure can be a cause of Renal Failure. All agree that the reading of 148/98 on August 12, 1996 was mildly elevated. Considering her prior intravenous drug use, Hepatitis C, and an elevated blood pressure, and a review of all evidence, it is quite evident that Phillisa Jackson was already in Renal Failure upon her admission to Avoyelles Bordelonville Correctional Center. However, there was no medical evidence to indicate same, and a slightly elevated blood pressure in and of itself is not conclusive of same.

The failure to monitor and treat Jackson's blood pressure certainly did not cause the Renal Failure. The expert testimony confirms that even had her blood pressure been monitored, the Renal Failure would have occurred regardless. Dr. Robin Bennett testified that there was nothing in the medical records of Phillisa Jackson which would have alerted a nurse or general practitioner prior to March of 1997 of Phillisa Jackson's impending Renal Failure. He also testified that it is quite evident that Phillisa Jackson's condition was "chronic."

Additionally, via Jackson's own testimony the swelling complaints did not begin until April of 1997. The nurses notes reflect April 21, 1997 as the first complaint of swelling. In only a matter of weeks thereafter, Jackson was transported to Huey P. Long Hospital.

Therefore, plaintiffs have failed to prove, more probable than not, that the actions of any of the defendants caused Phillisa Jackson's Renal Failure. Plaintiffs did prove that the defendants failed to follow their own policies and procedures and did prove that the defendants failed to monitor the blood pressure of Phillisa Jackson when they should have done so. However, they failed to connect these failures to the cause of Jackson's Renal Failure.

One could speculate at length about the effect upon Phillisa Jackson's condition had her blood pressure been monitored and had the reading continued to be elevated. However, not one expert testified that had this been performed, something could have happened to prevent the Renal Failure. In his trial testimony, plaintiff's expert, Dr. Thomas,

indicated that plaintiff's condition was beyond hope. In his rebuttal deposition, Dr. Thomas opined that early treatment could have at least identified the kidney problems and possibly could have saved the functioning of the kidneys without dialysis. However, he did not indicate the period of early treatment which would have been necessary, that being he did not indicate at what point "the early treatment" should have been provided.

The evidence presented by plaintiff simply fails to prove more probable than not, that any actions of the defendants caused the renal failure of Phillisa Jackson. One could assume that continued monitoring of the blood pressure, and if same continued to be elevated, medical personnel might have been alerted to other potential problems and Phillisa Jackson possibly could have received earlier treatment which would have prolonged her life. However, the evidence simply fails to conclusively prove, more probable than not, that it would have done so. Plaintiff's own expert, in his rebuttal deposition, indicates that had Phillisa Jackson seen a doctor earlier, she still may have had some kidney damage which may or may not have been reversible, stating "I can't speculate on that." He opined that she would not have had the absolute kidney destruction that she had. Immediately after that Dr. Thomas is asked, "would you agree that early treatment could have at least identified the kidney problems and possibly could have saved the functioning of the kidneys without a lifetime of dialysis?" To which Dr. Thomas answered, "yes, sir, absolutely." This evidence simply omits "when" the early treatment could have been provided and specifically what effect it would have had on Phillisa Jackson.

This Court can easily assume from the evidence that had Phillisa Jackson's blood pressure been monitored, and had same continued to be elevated, that further treatment would have been necessary. In fact, had it been monitored and had it remained elevated, this Court is convinced that the medical personnel would have taken further action. The evidence adduced at trial, however, simply fails to prove more probable than not that this would have made any difference in Phillisa Jackson's complete and total Renal Failure. Her condition was chronic in May, 1997. Quite possibly, detection prior to her admission to Avoyelles Bordelonville Correctional Center may have prolonged her life, however, the evidence does not convince one, more probable than not. The evidence in this issue is by speculation instead of definite opinion. In fact, Dr. Robin Bennett, an expert nephrologist, testified that his opinion was that Phillisa Jackson's Renal Failure was probably caused by high blood pressure and/or intravenous drug use and/or Hepatitis C. The exact cause could not be determined because it could be one or a combination of the causes. At best, in Dr. Bennett's opinion, if treatment for Renal Failure had been administered earlier, the progression of the failure would have been slowed. At what point this earlier administration should have been done and the specific effect has not been proven. However, the evidence concludes that while the blood pressure should have been continued to be monitored, there is no

evidence to prove that had it been monitored it would have continued to be high and that this was the cause of Phillisa Jackson's failure.

       Accordingly, plaintiffs have simply failed to prove that the actions of the defendants caused Phillisa Jackson's Renal Failure. They also have failed to specifically failed to [sic] prove that their actions contributed to her demise. Accordingly, their demands are DENIED.

Plaintiffs appealed the trial court's judgment, asserting the following assignments of error:

       1.   The Honorable Trial Court below committed clear, manifest and reversible error in applying the incorrect legal standard to the evidence adduced at trial, resulting in a finding that the plaintiffs had failed to demonstrate that the defendants' actions were a cause in fact of the injuries complained of.

       2.   The Trial court below committed manifest and reversible error in failing to find that the plaintiffs had proven that the defendants' negligence and deliberate indifference were a substantial factor in causing the renal failure experienced by Phillisa Jackson on May 9, 1997.

## ANALYSIS

Plaintiffs initially contend the trial court applied the incorrect legal standard to the evidence adduced at trial. They argue the trial court used a "but for" test rather than a "substantial factor" test in weighing the evidence. They point to the following examples in the trial court's written reasons for judgment to indicate it applied the wrong standard: "The first question is therefore, did the actions and/or failure to act committed by the defendants cause Jackson's renal failure?" and "Accordingly, the plaintiffs have simply failed to prove that the actions of the defendants caused Phillisa Jackson's renal failure." While this cited language could support Plaintiffs' argument, there is other language in the trial court's reasons for judgment, not cited by Plaintiffs, which indicates it used the "substantial factor" test. In its concluding paragraph, the trial court stated as follows:

       Accordingly, plaintiffs have simply failed to prove that the actions of the defendants caused Phillisa Jackson's Renal Failure. They also

have failed to specifically failed to prove [sic] that their actions *contributed* to her demise. Accordingly, their demands are DENIED.

Therefore, we find the trial court did apply the substantial factor test, but found the Plaintiffs failed to prove that the Defendants' negligence, fault or deliberate indifference "contributed to her demise."

We must now determine whether the trial court manifestly erred in arriving at this factual conclusion. In order to prevail on their negligence claim, the plaintiffs must prove all five elements of the "duty-risk" analysis. In *Perkins v. Entergy Corp.*, 00-1372, 00-1387, 00-1440, p. 7 (La.3/23/01), 782 So.2d 606, 611 (citations omitted), the supreme court stated:

> The determination of liability under the duty/risk analysis usually requires proof of five separate elements: (1) proof that the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (2) proof that the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) proof that the defendant had a duty to conform his conduct to a specific standard (the duty element); (4) proof that the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) proof of actual damages (the damages element).

The sole question before this court involves the causation prong of tort responsibility. Although finding in the Defendants' favor that their acts and/or omissions did not contribute to Ms. Jackson's renal failure, the trial court did find the Defendants failed to properly monitor Ms. Jackson's health. The trial court stated:

> Plaintiffs did prove that the defendants failed to follow their own policies and procedures and did prove that the defendants failed to monitor the blood pressure of Phillisa Jackson when they should have done so. However, they failed to connect these failures to the cause of Jackson's Renal Failure.

The parties do not assign this finding as error. Thus, the issue before us is whether the trial court correctly found Defendants' proven negligent conduct did not cause or substantially contribute to Ms. Jackson's renal failure.

We review whether a defendant's conduct was a cause in fact of a plaintiff's injuries under the manifest error standard. *Perkins*, 782 So.2d 606. Where multiple causes are present, courts generally employ the "substantial factor" test to determine whether a defendant's conduct played any part in bringing about the plaintiff's harm. *Roberts v. Benoit*, 605 So.2d 1032, 1042 (La.1991). If a defendant's conduct was a "substantial factor," the cause-in-fact element is established. *Id*. The *Roberts* Court also stated that in determining cause-in-fact, it is irrelevant whether the defendant's actions were "lawful, unlawful, intentional, unintentional, negligent or non-negligent." *Roberts*, 605 So.2d at 1042 (quoting Green, *The Causal Relation Issue in Negligence Law*, 60 Mich.L.Rev. 543, 549 (1962). "Rather, the cause in fact inquiry is a neutral one, free of the entanglements of policy considerations – morality, culpability or responsibility – involved in the duty-risk analysis." *Id*. at 1042. "[T]o the extent that a defendant's actions had something to do with the injury the plaintiff sustained, the test of a factual, causal relationship is met." *Id*. at 1042.

Briefly summarized, the relevant trial and deposition testimony follows:

DR. L.J. MAYEUX:

> Dr. Mayeux was the medical director of ABCC. He was also Avoyelles Parish Coroner and a board certified family practice doctor. As medical director of ABCC, Dr. Mayeux stated he set policy and procedures and oversaw emergency care.
> Dr. Mayeux testified that Phillisa Jackson had chronic renal failure rather than acute renal failure. He stated that symptoms of renal failure do not usually appear until 5 to 10% of kidney function remains. Dr. Mayeux also testified that edema is not a symptom of renal failure, but is a symptom of inactivity, increased salt intake and obesity. He also testified that a blood pressure reading of 148/98 was normal for a woman the size of Ms. Jackson. He somewhat altered that opinion by noting it was lightly elevated, but explained it was not remarkable due to her obesity and transfer to a new facility. Dr. Mayeux did acknowledge he would have rechecked the pressure and placed her on a low-salt diet and recommend weight loss. Dr. Mayeux was steadfast in his opinion that even if Ms. Jackson had been rushed to the hospital on April 21, 1997, after her initial complaints of edema, there would have been no change in her ultimate condition due to the chronic nature

of her renal failure.

DR. ROBIN BENNETT:

Dr. Bennett was accepted as an expert nephrologist. He noted that he never personally examined Phillisa Jackson and only reviewed her records beginning with her admission to ABCC. He did not review the records from Winn Parish.

Dr. Bennett testified that when she was admitted to LSU Medical Center, Ms. Jackson was in renal failure. The renal failure was of a chronic nature. He stated that possible causes of the renal failure were diabetes, hypertension, colitis, intravenous drug use, Hepatitis C or Sickle Cell Anemia. He believed the most likely causes for Ms. Jackson were high blood pressure, intravenous drug use, Hepatitis C, or any combination thereof.

Dr. Bennett stated that in 1996, a blood pressure reading of 148/98 was not considered significantly high, although it was "abnormal." Dr. Bennett testified he would have expected a higher reading than that if high blood pressure was the most significant cause of the chronic renal failure. He testified there was nothing in Ms. Jackson's medical records to have alerted medical personnel to a potential kidney problem prior to March of 1997.

On cross-examination, Dr. Bennett acknowledged Ms. Jackson's blood pressure should have been rechecked. He also believed if treatment for Ms. Jackson's high blood pressure had been administered earlier, it could have slowed the renal failure's progression. However, he maintained that Ms. Jackson's kidney failure was "profound," and she would have had total renal failure eventually.

Counsel for Ms. Jackson continually questioned Dr. Bennett on whether he changed his trial testimony from his previous deposition testimony, particularly on his previous deposition statement that "if I were betting money, it would probably be hypertension." Dr. Bennett testified since his deposition, he had been given for the first time the admission sheet from ABCC. He noted the admission sheet denied a history of hypertension and that the blood pressure of 148/98 was "not as I thought it was going to be." He stated it made him "less certain" of whether hypertension was the primary cause of the renal failure and made him "wonder more about the other processes here such as the drug use." He testified that "when somebody has hypertensive renal failure, the blood pressure is higher" than 148/98.

On cross-examination, Dr. Bennett was questioned as to the results of a metabolic panel taken when Ms. Jackson was at the Winn Parish Correctional Center. He noted he had not reviewed the panel results, but only saw it as referenced in Dr. Thomas' deposition. He stated that the BUN and creatinine readings, as stated in the deposition were normal. Dr. Bennett also confirmed that if Ms. Jackson's blood pressure was treated in 1996, and it didn't improve and metabolic panels were then run, it could have indicated to him the progression of kidney failure. Dr. Bennett agreed that controlling hypertension is the single most important factor in slowing the progression of renal disease.

When questioned by the trial judge, Dr. Bennett stated he would

have rechecked Ms. Jackson's blood pressure in three months. At that point if it was still elevated, he testified he would have initiated therapy. The judge also questioned Dr. Bennett concerning the metabolic panel and the 148/98 pressure reading. The judge also asked Dr. Bennett if, knowing the results of the metabolic panel taken in Winn Parish on July 18, 1995 and the 148/98 blood pressure reading taken in August of 1996, was there anything that stood out to give him cause for concern. Dr. Bennett stated he "would take it as normal."

On re-direct, Dr. Bennett confirmed that a patient will have edema throughout her body as a result of renal failure, rather than having renal failure as a result of edema.

DR. DAVID THOMAS:

Dr. Thomas was accepted at trial as an expert in correctional medicine. Dr. Thomas at one time was responsible for the medical care of the Florida Department of Corrections. He also had been previously accepted as an expert on the subject of renal failure. He reviewed all records concerning Ms. Jackson. Dr. Thomas believed Ms. Jackson's blood pressure reading of 148/98 was hypertensive and should have been followed. He acknowledged such a reading did not necessarily require treatment, but required monitoring. Dr. Thomas stated that he reviewed a metabolic panel taken on Ms. Jackson on July 24, 1995 while incarcerated in Winn Parish, and found the results to be "essentially normal." Dr. Thomas concluded the defendants exhibited an extreme lack of care due to the failure to monitor Ms. Jackson's blood pressure and take vital signs. Dr. Thomas also testified that the law entitles inmates to unrestricted access to health care, and that the defendants did not provide same.

On cross-examination, Dr. Thomas acknowledged that a person can be asymptomatic up to the point where they only have fifteen percent function remaining in their kidneys. He also confirmed that Hepatitis C is a major factor causing renal failure.

Dr. Thomas was also deposed following trial (the trial court allowed the record to remain open at the close of trial for submission of additional evidence), and stated that nothing he heard at trial from Dr. Mayeux or Dr. Bennett changed his opinion that hypertension caused Ms. Jackson's renal failure. He reiterated that Ms. Jackson's blood pressure should have been rechecked. He stated he would have done so within a month, at the latest. Dr. Thomas did acknowledge that cocaine can cause hypertension. He also testified that when Ms. Jackson presented with edema, she should have been sent to the hospital, evaluated with a metabolic profile, plus several other tests of renal function. Dr. Thomas was asked if Ms. Jackson's kidneys would have failed if in March of 1997 she had been sent to a doctor and a basic metabolic panel been performed. Dr. Thomas responded there may have been some irreversible damage, but he did not "think she would have had the absolute kidney destruction that she had." He believed that one kidney was small and shrunken, and he did not "think anybody could do anything with it had that been found earlier. . ." He believed that the

other kidney "possibly would have retained some function, maybe full function. . ."

On cross, Dr. Thomas acknowledged he could only speculate that one of the kidneys would have been saved if Ms. Jackson's renal problems were discovered in March of 1997.

The record establishes the first complaints voiced by Ms. Jackson which indicate any edema or swelling occurred on April 21, 1997, approximately eight months after her arrival at ABCC. Defendants maintained the medical evidence established that Ms. Jackson's chronic renal failure "probably pre-dated her transfer" to ABCC, was asymptomatic at the time of her transfer, and was irreversible by the time her symptoms appeared in April of 1997.[2]

Both Dr. Bennett and Dr. Thomas testified a person can be asymptomatic up to the point where they only have ten to fifteen percent function remaining in their kidneys. Dr. Bennett stated that when the kidneys have reached this level of function, the condition cannot be reversed and the kidneys will be lost regardless of dialysis. He stated as follows:

> Q. Now once the edema or the symptoms appear of the end stage renal failure, there's nothing you can do at that point, correct? I mean this is there and all you can do is put them on dialysis or give them a transplant?
>
> A. In the circumstance she was in, yes. Based on all the alternatives, this was (INAUDIBLE) . . .
>
> Q. So would it be your opinion if she had walked into your office at that time, your opinion would have been dialysis?
>
> A. She would have been admitted for dialysis.
>
> Q. You couldn't have stopped it?
>
> A. No, sir.
>
> Q. You couldn't have cured it?

---

[2] Although Phillisa Jackson went into full renal failure on May 9, 1997, and immediately began undergoing dialysis treatments, she did not die until January 26, 2004.

A. No.

Dr. Thomas, when questioned by plaintiffs' counsel, refused to categorically state that dialysis would have saved Ms. Jackson's kidneys:

Q. My question is assuming that it was diagnosed early on, and she had gone in for dialysis, could that dialysis have saved her from losing her kidneys?

A. There are hypothetically there are patients that are that way. Specifically on Mrs. Jackson I can't answer that.

Q. All right. I was just curious when you were managing the dialysis unit had you seen patients like that?

A. Yes, sir. There are patients that did not require permanent dialysis.

Q. And do you have any idea how far the renal problems had progressed in those patients that eventually got off dialysis?

A. Well in some of them moderately far. We don't know Ms. Jackson, we have no way . . . we have no idea what her BUN or [creatinine] was until (UNINTELLIGIBLE) . . .

Q. I guess it's too late in the day for me to articulate a question. What I'm trying to determine is if she had had dialysis could dialysis in and of itself have saved the kidneys if it were caught early enough?

A. I can't answer that question on Mrs. Jackson.

Q. All right, fair enough. If a patient had at least, a kidney patient had at least fifteen per cent function and went on dialysis, you have any experience or any thoughts with respect of whether dialysis with a patient that had fifteen per cent kidney function could have saved that fifteen per cent?

A. We have . . . certainly when I was responsible for the dialysis unit, we had patients with very low kidney function, fifteen per cent who did not require permanent dialysis. That's correct.

Q. So if the dialysis went on that patient who you treated there's a good likelihood if it were caught early enough, she would not have totally lost the kidneys?

A. As I've said Mr. Cave, I can't say that . . .

Although Dr. Thomas testified when Ms. Jackson presented with edema, she should have been immediately sent to the hospital, evaluated with a metabolic profile, and

-14-

been evaluated with several other tests of renal function, the medical evidence indicates this would have been of little consequence. Ms. Jackson first complained of edema on April 21, 1997.[3] It was approximately two and a half weeks later that she was sent to Huey P. Long Hospital, where she was diagnosed with full renal failure. Even Dr. Thomas, when asked if Ms. Jackson, by *March* of 1997, had been sent to a doctor and a basic metabolic panel performed, would she have been able to prevent loss of her kidneys, responded there would have been "some irreversible damage." Dr. Bennett testified by March of 1997, it was his belief that Ms. Jackson's kidney failure was "profound," and total renal failure was inevitable.

The trial court, while acknowledging the possibility that earlier detection of Ms. Jackson's kidney problems *may have* prolonged her life, noted that the evidence presented on this issue was "by speculation instead of definite opinion," and "does not convince one, more probable than not." Dr. Thomas in his testimony acknowledged his expert conclusions were based on speculation:

> Q. I'm still unclear as to what you believe the effect of discovering Ms. Jackson's condition in March of 1997 would have been.
>
> A. That's because I was somewhat unclear. Had she been seen and evaluated in March when she developing the edema – the edema is the reflection of the kidney failure. Patients generally don't fail irrevocably in a catastrophic momentary way. They fail – there are signs of edema and vomiting and feeling sick and things like that are assigned to that, and at some point in time if you intervene, the failure can be reversible. My recollection is two months later there was a CAT scan that showed a small shrunken kidney on the one side, and that one I don't think anyone could do anything with had that been found earlier, but I don't know. The other one possibly would have retained some function, maybe full function, and as you know from newspapers and literature, people can live fine with just one kidney.

---

[3] This date is established by ABCC's records and is corroborated by Ms. Jackson's deposition testimony, wherein she stated that she believed the swelling in her feet first began in April of 1997 and that she complained of the symptoms that brought her to the hospital for about three weeks. The emergency records at Huey P. Long stated that Ms. Jackson was admitted for "retention of fluid/edema for approximately 1½ weeks." They also list she "complain[ed] of general swelling for three weeks, urine output decreased."

Q. But its your testimony that you're not aware of what the condition of the one possibly still-alive kidney was as of – I'll represent May 9, 1997 is when she had her full-scale renal failure.

A. That's correct, I don't know what it was on May 9th with full-scale renal failure.

Q. In the testimony, I believe it was an ultrasound of Ms. Jackson's kidney taken on or about May 9, 1997. Is it your testimony that the ultrasound did not show what the other kidney was doing?

A. Well, its my understanding that one was shrunken and dead and the other one was not. So one has to assume that even in spite of her rather cataclysmic renal failure that that kidney may have still been viable, or may not have been, and obviously it turned out it wasn't. The earlier it was found – for instance, if it was found in March, that kidney may have been viable.

Q. But as you say, that's speculation?

A. *Yes, sir. That's expert opinion, but it's a speculation of my expert opinion.*

The jurisprudence is clear that "[o]ne must prove what probably happened as opposed to what 'could' have happened and what is a 'statistical possibility.'" *Perkins v. Entergy Corp.*, 98-2081, p. 18 (La.App. 1 Cir. 12/28/99), 756 So.2d 388, 407, *affirmed*, 782 So.2d 606. "Proof which establishes only possibility, speculation, or unsupported probability does not suffice to establish a claim." *Todd v. State, Department of Social Services, Office of Community Services*, 96-3090, p. 16 (La.9/9/97), 699 So.2d 35, 43.

Further, a trial court's findings on the factual issue of causation cannot be disturbed unless they are manifestly erroneous. When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review we should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and

reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. *Canter v. Koehring Co.,* 283 So.2d 716, 724 (La.1973).

Resolution of the causation issue under the facts of this case does not involve the acceptance of the testimony of one set of experts and the rejection of another based on credibility. The issue here is not credibility of the evidence but sufficiency of the evidence. Plaintiffs have not presented any specific testimony to establish that any different treatment by ABCC would have prevented or minimized Ms. Jackson's renal failure and extended her life beyond the nearly seven years she actually lived from the date her condition manifested itself. Absent such evidence, the manifest error standard requires affirmance of the trial court's judgment.

**Scottsdale's Motion for Involuntary Dismissal.**

Following the presentation of the plaintiffs' case at trial, Scottsdale Insurance Company, which provided a policy of insurance to the Avoyelles Parish Sheriff's Department, moved for an involuntary dismissal of the claims against it based on exclusionary policy in its policy. The trial court denied the motion for involuntary dismissal. Scottsdale answered the plaintiffs' appeal, asserting the trial court erred when it denied Scottsdale's motion for involuntary dismissal.[4]

Scottsdale argues the following exclusionary language from its policy protects it from any liability in this case:

> The Company shall not be obligated to make any payment nor to defend any SUIT in connection with any CLAIM made against the INSURED:
>
> . . .

---

[4] Although we affirm the trial court's judgment that Plaintiffs failed to prove the liability portion of her case, we address this argument because Plaintiffs still have the right to apply for a writ of review to the Louisiana Supreme Court and disposition of this issue may bear on the insurer's duty to defend.

VI.    Arising out of the rendering of, or failure to render any medical services by any licensed medical personnel.

Scottsdale argues the Avoyelles Parish Sheriff's Department relied on licensed medical personnel at ABCC to monitor the condition of the inmates and make decisions concerning their medical care.  Therefore, the plaintiffs' claims, "which seek compensation for damages related to the failure of the medical personnel to provide appropriate medical services to Jackson, should have been dismissed by the trial court, at the time of the Motion for Involuntary Dismissal."

Plaintiffs argue Scottsdale's appeal should be dismissed under the "law of the case" doctrine.  That doctrine applies to prior rulings of appellate courts and, generally, provides that an appeal court will not reconsider its own rulings of law in the same case. *Gentry v. Biddle*, 05-61 (La.App. 3 Cir. 11/2/05), 916 So.2d 347. Plaintiffs note that Scottsdale previously urged this defense by motion for summary judgment in the trial court when same was before the Nineteenth Judicial District Court in Baton Rouge.  The trial court denied Scottsdale's motion and it applied for writs with the First Circuit Court of Appeal, under docket number 2000-CW-2701. The First circuit denied writs, and Scottsdale sought writs to the Louisiana Supreme Court, which also denied.  After the matter was transferred to the Twelfth Judicial District Court, Scottsdale again filed another motion for summary judgment seeking dismissal on the same lack of coverage grounds.  The trial court  denied the motion. Scottsdale then filed the current motion at the conclusion of plaintiffs' case, which was also denied.

Plaintiffs note the purpose of the law of the case doctrine is to avoid re-litigation of the same issue.  However, since this court has not rendered a decision on this issue we decline to apply the law of the case doctrine, and will address

Scottsdale's arguments.

Provisions in an insurance policy seeking to restrict an insurer's obligation are strictly construed against the insurer. *Blackburn v. National Union Fire Ins. Co. of Pittsburgh*, 99-1872 (La.App. 3 Cir. 8/23/00), 771 So.2d 175, *reversed on other grounds*, 00-2668 (La. 4/3/01), 784 So.2d 637. If more than one reasonable interpretation exists regarding a policy exclusion, the interpretation which favors coverage must be applied. *LeBlanc v. American Int'l Ins. Co.*, 99-1583 (La.App. 3 Cir. 3/22/00), 760 So.2d 387. Any exclusion from insurance coverage must be clear and unmistakable. *Duncan v. U.S.A.A. Ins. Co.*, 06-363 (La. 11/29/06), ___ So.2d ___.

As the courts below noted, many of the defendants in question were acting in a dual role capacity for Sheriff Belt. Many of the nurses named by Plaintiffs were also commissioned deputies. Further, numerous named defendants (Sheriff Belt, Warden Normand, etc.) were not medical personnel. Plaintiffs also note that the damages sought are not in the nature of a medical malpractice case, but that of a denial of civil rights and ordinary negligence action occurring in a law enforcement environment. Therefore, as any ambiguities or uncertainties are to be resolved in favor of coverage, we find no error in the trial court's denial of Scottsdale's Motion for Involuntary Dismissal.

## DECREE

For the foregoing reasons, the judgment of the lower court is affirmed. Costs of this appeal are assessed equally against Plaintiffs and Scottsdale Insurance Company.

**AFFIRMED.**

**THIS OPINION IS NOT DESIGNATED FOR PUBLICATION. Rule 2-16.3, Uniform Rules, Courts of Appeal.**